# MERIDIAN, INC., etc. v DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES and MERIDIAN, INC., etc. v DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES, et al.

Case Nos. 86-2685 and 86-3526

State of Florida, Division of Administrative Hearings

July 7, 1987

## APPEARANCES OF COUNSEL

**Thomas W. Stahl** for petitioner.

**Richard A. Patterson** for respondent, Department of Health and Rehabilitative Services.

**Elizabeth McArthur** for respondent, Adventist Health Systems/Sunbelt d/b/a Lake Alfred Restorium.

## OPINION OF THE COURT

LINDA M. RIGOT, Hearing Officer.

## RECOMMENDED ORDER

Pursuant to notice, this cause was heard by Linda M. Rigot, the assigned Hearing Officer of the Division of Administrative Hearings, on March 11-13, 1987, in Lakeland, Florida. The parties completed their post-hearing submissions on June 1, 1987.

Petitioner Meridian, Inc., d/b/a Meridian Nursing Center—Polk (hereinafter "Meridian") and Respondent Adventist Health Systems/Sunbelt, d/b/a Lake Alfred Restorium, (hereinafter "Lake Alfred") filed with Respondent Department of Health and Rehabilitative Services (hereinafter "HRS") certificate of need applications in the January, 1986 review cycle for nursing home beds to be located in Polk County, Florida. Meridian requested a certificate of need (hereinafter "CON") for 120 nursing home beds to be added to a CON-approved 60-bed facility, at a projected total cost of $2,842.556. Lake Alfred requested a CON to transfer 6 existing nursing home beds and add 20 new beds to an existing 31-bed nursing home in Lake Alfred, Florida at a projected total cost of $500,000. HRS comparatively reviewed the applications and notified the applicants in June, 1986 that HRS intended to approve Lake Alfred's application and deny Meridian's application. Meridian filed petitions for formal administrative hearing to contest the preliminary denial of its CON application and to contest the preliminary approval of Lake Alfred's CON application.

Prior to the final hearing, the parties stipulated that a need exists for 29 additional nursing home beds in Polk County, Florida, for the January, 1989 planning horizon as identified by the need methodology contained in Rule 10-5.011(k), *Florida Administrative Code.* The parties further stipulated that the criteria contained in Section 381.494(6)(c)4, 6, 7, 8, 10, and 11, *Florida Statutes,* are not at issue in this proceeding. The criteria which remain at issue are those found in Section 381.494(6)(c)1, 2, 3, 5, 9, 12, and 13, *Florida Statutes.* Prior to the final hearing, Meridian indicated its intention to invoke its statutory right to carve out an identifiable portion of its application in order to seek only the 29 beds available in Polk County for the 1989 planning horizon. Lake Alfred's Motion in Limine which attempted to prevent Meridian from carving out an identifiable portion of its application was denied, and this cause proceeded to final hearing with Meridian seeking the available 29 nursing home beds and Lake Alfred relying on its application for 20 nursing home beds. Since the need for those beds is no longer at issue in this proceeding, the sole issue for determination is which applicant, Meridian or Lake Alfred, best satisfies the applicable statutory criteria. Otherwise stated, the issue is

whether it is better to add 29 beds to Meridian's facility or to add 20 beds to the Lake Alfred facility.

Meridian presented the testimony of E. Wendell Hall, David D. Carliner, Sylvia R. Cohen, Melanie Phillips Cox, and Joseph G. Dvorak. Additionally, Meridian's Exhibits numbered 1 and 3-10 were admitted in evidence.

Lake Alfred presented the testimony of Joseph H. Brownlow; Betty Moore; Lavon Ruth Childers; Cecil Christian; Jan O. Rushing; Ernest DiLorenzo; Murrill Jones; Maryann Judkins; Gloria Newton; Gary Silvers; Eleanor Dame; and Daniel R. Curran. Additionally, Lake Alfred's Exhibits numbered 1-12, 16 and 18-22 were admitted in evidence.

HRS presented the testimony of Herbert E. Straughan. It offered no exhibits.

All parties submitted post-hearing proposed findings of fact in the form of proposed recommended orders. Specific rules on each proposed finding of fact can be found in the Appendix to this Recommended Order.

## FINDINGS OF FACT

1. Lake Alfred is a 31-bed licensed nursing home in Lake Alfred, Florida. It has been in existence since 1968. Adjacent to the nursing home is an adult congregate living facility (hereinafter "ACLF"), used by residents who are not in need of constant nursing care. In May, 1985 the ownership of Lake Alfred and the ACLF was transferred to Sunbelt Health Care Centers, Inc., a Tennessee nonprofit corporation, which in turn is owned by Adventist Health Systems/Sunbelt. The purchase price was $800,000.

2. Adventist Health Systems/Sunbelt operates 19 hospitals and 13 nursing homes in the Sunbelt area of the United States. Sunbelt Health Care Centers, Inc., operates long term health care facilities, including nursing homes, ACLFs, and retirement facilities.

3. Lake Alfred has been losing money, operating on a tight budget, because of the limited revenue generated by only 31 beds. Additionally, any profits are paid over to Sunbelt. It is generally accepted by health planners that small nursing homes are inefficient economically and that economies of scale increase as the number of beds increase to 60. A 51-bed nursing home is more economically efficient than a 31-bed nursing home. One of the reasons for economies of scale are that many regulatory requirements, such as staffing requirements, are set in terms of 60-bed groupings. The ACLF also provides a continuum of care not

218

offered by Meridian, and deemed advantageous by health planners and hospital discharge planners.

4. The prior owners of Lake Alfred had plans prepared in 1983 to expand the nursing home by relocating 6 of the existing beds and adding a new wing onto the nursing home to house the 6 relocated beds plus 20 new beds.

5. When Lake Alfred was transferred to the Adventist system, steps were immediately taken to implement the expansion program. CON approval for the 20-bed expansion, for which plans were already in existence, was sought. To reach the optimally efficient size of 60 beds, a second CON application was filed in the next HRS review cycle for a 9-bed expansion.

6. Lake Alfred has built a very good reputation in the community for its ability to provide high quality care to its patients, according to its medical director, its pharmacist consultant, the head of discharge planning at one area hospital, and a retired HRS licensure inspector who surveyed and inspected the nursing care at Lake Alfred over a period of many years and as recently as 1986. Lake Alfred operates under a standard license, meeting all HRS minimum licensure requirements.

7. Lake Alfred enjoys an active relationship with many civic organizations, schools and churches who help sponsor activities and entertainment for the nursing home residents.

8. Although Lake Alfred's reputation for quality of care is high, a number of changes to the physical facility itself are necessary in the near future. The kitchen equipment is very old and needs replacing. The laundry and administrative areas are currently housed in a detached building adjacent to the nursing home. It is beyond repair and cannot continue to house these services. Ancillary space is extremely limited: there are no offices for the Director of Nursing, for the Activities and Social Services Director, or for the dietary personnel; and there is one small room now that is used as the dining room, lobby, visiting area and activities room. The lack of space hampers the ability of the professional staff at Lake Alfred and they could function better and provide a greater level of activities and services to the patients with additional ancillary space.

9. Although the capital projects required to address these problems would not require a CON if their cost were below the capital expenditure threshold and no new beds were added, Lake Alfred's new owners are not willing to renovate the facility unless additional beds are added.

10. At final hearing, Lake Alfred Restorium presented changes to its

**219**

projections with respect to staffing, construction and project costs, and operating revenues and expenses.

11. At final hearing, Meridian presented a proposal for a 29-bed addition to its 60-bed CON approved facility, representing it to be a scale-down of its original 120-bed expansion application. Meridian thus seeks "partial approval" of its original CON application.

12. Since Meridian's standard facility design consists of wings extending out from a central core, expansion by any number of beds is relatively simple both in terms of construction and cost projection. Reducing the staffing needs and other expenses for the initially-sought 120-bed expansion down to 29-bed consists primarily of mathematical calculations and in fact eliminates some costs, such as pre-opening expenses, altogether.

13. Many factors contribute to the quality of care provided by a nursing home. One such factor is the level of staffing that will be provided at the facility. Higher staffing levels are desirable in a nursing home because as nursing home residents become more dependent and have greater health care needs, the nursing home must be capable of providing more assistance with activities of daily living and it must also have sufficient staff to meet the increased health care needs of the residents. HRS gives recognition to the fact that higher staffing levels result in a higher quality of care by granting higher licensure ratings to nursing homes with higher staffing levels. The staffing levels proposed by Meridian exceed minimum requirements and use more licensed staff than Lake Alfred's staffing levels which meet minimum requirements.

14. Another indicator of the applicant's ability to provide quality care is the number of hours of direct patient care that will be provided to each patient per day. Generally speaking, the more hours of care given to a patient per day, the better the quality of care that patient will receive. Hours of care per day is a recognized method of measuring nursing care in the nursing home industry and much of the data on the national level is collected in terms of hours of care per day. Although Florida does not express staffing requirements in terms of hours of care per day, most states do use hours of care per day in their nursing home staffing requirements.

15. A computation may be made based on an applicant's proposed staffing levels to determine the number of hours of direct care per day each resident of the nursing home will receive. Meridian proposes to staff its facility with sufficient staff to provide 2.69 hours of care per day to each patient. Lake Alfred originally proposed to staff its facility at levels providing only 1.68 hours of care per days. Although Lake

220

Alfred submitted an amended staffing projection which increased the hours of care per day to 2.35, this increase may not be considered for reasons discussed in the Conclusions of Law section of this Recommended Order. Assuming, arguendo, that Lake Alfred did properly "update" its staffing projections, the hours of care available to the residents of Meridian's proposed facility is higher than both the original and "update" staffing levels proposed by Lake Alfred. Based on the direct hours of nursing care each resident can expect to receive, Meridian will provide higher quality of care than Lake Alfred.

16. Both applicants operate a number of nursing homes or other health care facilities in Florida and other states. The resources provided by the home office of each applicant varies considerably with regard to a commitment to provide quality care. Meridian's home office, through the staff of a Corporate Director of Nursing, conducts monthly visits to each Meridian facility. The monthly visits are designed to provide support to the facility's Director of Nursing, to help in problem identification and problem solving, and to monitor the quality of care being delivered in each facility. Adventist Health Systems/Sunbelt, the owner of Lake Alfred, does provide various consultants to assist Lake Alfred in different areas, but the evidence suggests that the corporate commitment to quality of care is not as strong as that made by Meridian.

17. Meridian strives to obtain superior license ratings at all of its facilities and is willing to devote the necessary corporate resources to obtain a superior rating at its Polk County facility. Lake Alfred, on the other hand, retained a conditional rating for several months after Aventist Health Systems/Sunbelt assumed ownership in May, 1985 and to date has never received a superior rating.

18. Both applicants provide training for their staff. Meridian provides training for its staff at both the corporate level and at each facility. Meridian employs a master's degreed nurse-practitioner specializing in gerontology to oversee the overall training of Meridian staff. All licensed staff from each Meridian facility participate in four training sessions each year. In addition, Meridian provides training programs at each facility specifically directed to the individual needs of a given facility. Meridian also conducts annual training sessions for the nursing assistants from each facility.

19. Meridian has also developed a career advancement program for its licensed staff and nursing assistants. The career advancement program is designed to assist licensed staff with the formal advancement of their careers by providing additional work in both clinical and

221

managerial roles. The clinical program emphasizes functional and mental assessments and prepares the nurse to take the certification exams of the American Nursing Association to become a certified gerontology nurse-practitioner. Meridian also offers special training in which licensed staff can do advanced work in the clinical, managerial, research, or training areas of the nursing home. There is no evidence that Lake Alfred offers a career advancement program or other special training to its staff above that required for HRS licensure in Florida.

20. Meridian offers several different levels of career advancement programs to its nursing assistants: a certification program, a 14-week program dealing with behavioral management, and assistance in obtaining a GED for nursing assistants who are not high school graduates. Meridian also provides tuition reimbursement and conducts classes at each facility for those employees working towards a GED.

21. Meridian provides nursing scholarships at each facility as well as scholarships at nine different academic institutions.

22. Meridian has developed internal standards of care which are more stringent than the minimum Florida requirements. These internal standards are designed to result in a high level of quality of care through the use of detailed, quantifiable standards, such as how many residents are being syringe fed, the number of residents in protective devices, and the examination of intake and outputs to ensure adequate hydration. In contrast, the internal policies and procedures utilized by Lake Alfred are those required by Florida regulations.

23. Meridian has developed performance standards for its staff which include identifiable criteria as to what is acceptable performance, highly effective performance, and nonacceptable performance. Such performance standards are common in the acute care field but are unique in the area of long-term care. Lake Alfred presented no evidence as to the performance standards required of its staff.

24. Meridian has a quality assurance program which provides for detailed inspections of each Meridian facility on a semi-annual basis. These inspections look not only at nursing issues but also at the other services which affect the care being provided to the residents, such as the dietary and housekeeping services.

25. In addition to the training programs, performance standards, and quality assurance programs, Meridian engages in a special "Quality of Life" program designed to enhance the quality of care delivered to the residents of Meridian facilities. The Quality of Life program was developed twelve years ago when the top corporate officers of Meridian, including the chairman of the board and the president, examined

222

the components which go into the delivery of quality services in a nursing home. Meridian determined that in order to operate a high quality nursing facility, the facility must go beyond the traditional clinical nursing component and must focus on the psychological, social, and emotional needs of the residents. This special focus is premised on the fact that people come to live in a nursing home as whole human beings and they bring with them a variety of needs beyond their actual physical needs.

26. In order to be responsive to the special needs of nursing home residents, Meridian makes a commitment to provide an environment in which residents have the opportunity to continue to lead some kind of meaningful life. A key element of the Quality of Life program is a philosophy that all staff members and all departments of the nursing home play a key role in determining the quality of the environment in a nursing facility and all staff members have a responsibility to support efforts to make the facility a better place to live. In order to implement this philosophy, there must be sensitivity to the feelings and needs of residents in nursing homes and such sensitivity must extend not only to the people who provide the actual hands-on care, but to the entire organizational structure of the nursing home. All Meridian staff, including the nursing staff, housekeeping staff, maintenance staff, dietary staff, and office staff are involved in sensitivity and psychosocial training. In order to heighten the sensitivity of its staff members and to promote positive attitudes towards the care of the residents, Meridian engages in training programs in which staff members experience some of the impairments that a typical nursing home resident might experience. This sensitivity training involves the deprivation of senses, such as the wearing of obscured glasses to simulate impaired vision or cotton in the ears to simulate impaired hearing. Staff members are put in wheelchairs or bound in geriatric chairs to stimulate a physical handicap and are fed in silence while blindfolded to simulate the experience of having both visual and auditory impairment. This sensitivity training takes place at all Meridian facilities, and a sensitivity workshop will be conducted in Meridian's Polk County facility prior to its opening.

27. Meridian's Quality of Life program is an integral part of the performance appraisals of all Meridian employees. The Quality of Life program is also part of the operating manual for the entire corporation.

28. The Quality of Life program created by Meridian is unique in the long-term care industry because of the commitment by the entire organization, from top management to the housekeeping staff, to the importance of the psychosocial component of care for the elderly.

29. Meridian will provide several special services at its facility, such as telephone reassurance, respite care, and assessment counseling. Respite care is a structured program designed to allow people to enter a nursing home on a short-term basis. This short-term care provides a respite, or break, for a family which has been providing care at home for the patient. Telephone reassurance is a support network for elderly people living on their own who would be aided by receiving a daily telephone call. The daily telephone calls are made by residents of the nursing homes, which gives the residents a feeling of purpose and self-worth. Assessment counseling is a service to persons with long-term care problems who are often overwhelmed by health considerations, financial considerations, and family considerations. Every Meridian facility employs a director of family community services who is familiar with the long-term care services available in the community and who works with families to determine the options that are most appropriate. There is no evidence that Lake Alfred will offer any special programs or services.

30. Meridian offers special projects oriented towards improving care to the resident, such as activities programs on the evening shift, or special activities with residents that awake in the middle of the night.

31. Meridian is involved in various research projects at its facilities and at several universities. The research projects include an Alzheimer's study unit, a dementia clinic at John Hopkins University, and a study at the University of Maryland to examine nursing intervention and assessment of confused residents. Although the need for research facilities is not at issue in this case, the commitment to research by Meridian is an indicator of Meridian's commitment to providing high quality care.

32. Another indicator of the applicants' ability to provide quality care is the amount each applicant proposes to spend on direct patient care per day. Direct patient care expenditures are those amounts spent on nursing staff, professional medical services, activities, and dietary supplies and salaries; patient care expenditures do not include any expenses for overhead, administration, or management fees. Meridian proposes an expenditure of $31.79 per day on each resident for direct patient care during the second year of operation. Lake Alfred projects a patient care expenditure of only $21.91 per day for the same period of time. Lake Alfred's projected expenses for direct patient care are unrealistic and are less than the actual patient care costs presently being submitted by Lake Alfred to the Florida medicaid office. The reasonableness of the patient care expenses proposed by Meridian is evidenced by the fact that the Medicaid reimbursement cap established

224

for patient care is $40.51, which is based on the actual cost of patient care in the Polk County medicaid district. The actual cost of direct patient care per day in the Polk County medicaid district is in the $30-40 range and is significantly higher than the unrealistically low patient care expenditures proposed by Lake Alfred.

33. The patient care expenditures proposed by Lake Alfred results in an unacceptable and unrealistic level of only $1.38 for food per patient day.

34. Competent testimony was introduced to show that Adventist Health Systems/Sunbelt, the corporate owner of Lake Alfred, is unwilling to commit the resources to remodel and upgrade the Lake Alfred facility without first obtaining the increased revenues associated with additional beds, although the Adventist organization could contribute the necessary funds to renovate the facility if it chose to do so. This failure to commit resources to the upgrading of Lake Alfred's facility is evidence of the corporate owner's questionable commitment to providing high quality care in view of the fact that Adventist Health Systems/Sunbelt has annual revenues in excess of a billion dollars and enjoys a nonprofit, tax-exempt status. Lake Alfred's "consulting administrator" admitted that the lack of resources available to Lake Alfred prevented the facility from providing certain services to its residents.

35. Both applicants enjoy the joint purchasing power, management expertise, and economies of scale associated with multi-facility health care organizations. Meridian, however, strives to provide superior service to its residents through corporate-wide training programs, quality standards, and research activities. There is no evidence that Lake Alfred provides any special services or programs as a result of its affiliation with Adventist Health Systems/Sunbelt.

36. The projected patient utilization and the projected revenues and expenses contained in Meridian's application are realistic and reasonable based on the unchallenged evidence presented by Meridian at hearing. The projections show that Meridian's proposed facility will operate with a positive net income after taxes for both the first and second years of operation.

37. The revenues and expenses projected by Lake Alfred do not realistically reflect the operation of Lake Alfred's facility. The projected patient utilization of Lake Alfred's facility contains discrepancies when compared with other projections submitted by Lake Alfred. The evidence suggests that Lake Alfred overstated the patient utilization for the first year of operation, with a corresponding increase in projected revenues, and understated the patient utilization for the second year of

operation. Lake Alfred's expert financial witness could not explain the discrepancies between the various patient utilization projections submitted by Lake Alfred. These inconsistencies in Lake Alfred's application cannot be explained as mere mathematical or typographical errors, and it must be concluded that Lake Alfred failed to introduce competent evidence with regard to the projected patient utilization of its proposed facility. Lake Alfred's application contains other discrepancies which cannot be explained. For example, Lake Alfred projects total construction costs of $515,136 in one area of its applications and projects $491.136 for construction costs in another area. Lake Alfred's witness who prepared the application admitted that certain remodeling costs were omitted from the total cost of construction. These discrepancies were not explained and it is impossible to give any credibility to the construction cost projects submitted by Lake Alfred.

38. Meridian proposes a Medicaid rate for its second year of operation of $64.68 per patient day, as compared with Lake Alfred's Medicaid rate of $49 per patient day. The difference of $15.68 between the two Medicaid rates is largely due to the fact that Meridian will spend $13.35 more than Lake Alfred on direct patient care per patient day. In other words, $13.35 of the $15.68 difference in the Medicaid rates proposed by the applicants is attributable to direct money spent on patient care by Meridian.

39. The revenues and expenses projected by the applicants show that Meridian will operate a more efficient facility than Lake Alfred. Meridian projects operating costs of $11.36 per patient day while Lake Alfred proposes operating costs of $14.69. Operating costs include general administrative expenses and the costs associated with physically operating a nursing home. Operating costs are an indication of a facility's operating efficiency and the evidence shows that Meridian's facility will be more efficiently operated than Lake Alfred's facility.

40. The evidence presented by Lake Alfred relating to the financial feasibility of its project contains conflicting testimony regarding the sharing of expenses and revenues between Lake Alfred's existing ACLF and the nursing home. Because of the conflicts in the testimony concerning the financial relationship between the ACLF and the nursing home, it is impossible to determine from this record the financial feasibility of Lake Alfred's proposal.

41. At the hearing, Lake Alfred's expert financial witness attempted to increase Lake Alfred's patient care costs by reallocating fringe benefit expenses from general and administrative expenses to patient care expenses. Such a reallocation would serve to decrease Lake Alfred's operating costs and increase the amount spent on direct

226

patient care. He admitted, however, that he was not aware of the actual fringe benefits offerd at Lake Alfred and that he did not know the exact amount of fringe benefits which should be allocated to patient care.

42. The patient charges proposed by Meridian and Lake Alfred are within the range currently being charged by facilities in Polk County. There is no evidence that either applicant would adversely affect the cost of nursing home services in Polk County or would provide unfair competition against existing nursing homes in Polk County.

43. Meridian proposes to construct a 29-bed addition to a CON-approved 60-bed facility at a total construction cost of $448,400. Meridian's proposed addition could be constructed and licensed under current HRS regulations. The ancillary areas, such as the kitchen and dining areas, contained in Meridian's 60-bed facility are sufficiently large to support the 29-bed addition. The patient rooms proposed by Meridian are larger than the minimum size required by HRS regulations. The Meridian proposal will cost $59 a square foot to construct, which is a reasonable cost estimate based on other facilities Meridian has recently constructed in Florida.

44. The Dodge Report, which contains data on average costs for the construction of nursing home and which is used by HRS to determine the range of reasonable construction costs, indicates that nursing home construction costs range from a low average of $56.25 per square foot to a high average of $62.24, with the average being $59.34 per square foot.

45. Lake Alfred originally proposed to construct 20 new nursing home beds, transfer six licensed beds from the existing facility, and make substantial renovations to the laundry, kitchen, and dining area of the existing facility, for a total construction cost of $412.944. The original construction cost projected by Lake Alfred was $42 per square foot.

46. There is much confusion as to the actual construction costs of Lake Alfred's project. Lake Alfred submitted "updated" construction costs at hearing which increased the projected construction costs from $42 to $48 per square foot, for a total construction cost of either $515,136, $491,136 or $541,136 ($491,136 plus $50,000 renovation costs), depending upon which of Lake Alfred's exhibits is the most reliable. Lake Alfred admitted that the total construction cost figure of $515,136 listed in Lake Alfred's application is "lacking some remodeling" costs associated with bringing the building up to minimum code requirements.

**227**

47. Lake Alfred increased the cost of its project from $42 to $48 per square foot because the "updated" figure of $48 per square foot for construction costs was "more accurate, a more realistic assumption" than the $42 per square foot contained in the original application. Lake Alfred's architectural witness admitted that construction costs have been very stable for the last two years. The reason for Lake Alfred to "update" its construction cost estimate cannot therefore be based on general increases in construction costs; the update to Lake Alfred's construction cost estimates was instead made in an attempt to shore up an unsupportable section of the original application.

48. The reliability of Lake Alfred's construction cost estimates also must be questioned in light of the testimony by Lake Alfred's architectural witness that an accurate cost estimate for the demolition work associated with Lake Alfred's project had "not been derived." In fact, the architects who testified in this proceeding seem to agree that due to the Type V construction at Lake Alfred no one can even guess the amount or cost of renovations until after the remodeling begins.

49. Competent evidence was introduced by Meridian showing that the $48 per square foot projected by Lake Alfred for construction costs is too low and is not a realistic cost. Other evidence was introduced by Meridian indicating that the contracting company responsible for quoting the $48 per square foot figure to Lake Alfred was "unreliable on costs."

50. The construction philosophy for health care facilities differs somewhat from other commercial buildings. Most nonhealth care buildings are designed to be evacuated quickly in the event of fire; health care facilities are designed to provide protection in place for the occupants because the occupants are often nonambulatory patients.

51. Meridian proposes to build its facility with Type I construction, which is self-protecting and noncombustible. Type I construction is the most desirable method of construction for health care facilities.

52. Lake Alfred's existing facility is Type V construction, in which the interior partitions and the roof trusses are wood. Type V construction is a very undesirable method of construction for health care facilities because of the combustible wood partitions and the wood studs in the walls. HRS will not license a new facility built with Type V construction because it is nonconforming to current HRS building codes. HRS will allow modest modifications to improve a Type V facility, but the agency would prefer that a Type V facility be totally replaced rather than deal with the problems associated with bringing a Type V facility up to current life safety code requirements. Lake

228

Alfred's architectural witness admitted that he would not advise a client to build a new health care facility in Florida using Type V construction because of the difficulties in obtaining licensure from HRS for a Type V facility.

53. The sole witness for HRS admitted that he had not reviewed the applications of Lake Alfred or Meridian prior to the final hearing in this cause, that he was not aware of what type construction was used in the Lake Alfred facility, that HRS had not considered the cost of bringing the Lake Alfred facility up to current code standards when HRS preliminarily approved Lake Alfred's application, and that he did not know whether the cost of bringing Lake Alfred's facility up to current code would have an impact on the feasibility and cost estimates contained in Lake Alfred's proposal.

54. The original floor plans submitted by Lake Alfred contain a number of design flaws which lead to the conclusion that the proposal is less than desirable. The floor plans show the nurses' station directly opposite the entrance to the faciity, which would result in the nursing staff acting as receptionist to the public. The toilets for handicapped persons open directly into the lobby, which although not prohibited by code requirements, is not a desirable plan. Lake Alfred's architect admitted that such a plan was "slightly awkward."

55. Because of the differences in elevation at the site of the Lake Alfred facility, the original plans require the ramp for handicapped access to be approximately 110 feet long. Lake Alfred's current architect, who proposed new plans, indicated that it would be better to fill the area with fill dirt and concrete rather than use a ramp. There is no evidence as to the cost of such fill, and no evidence that the costs were included in Lake Alfred's construction cost estimates.

56. The floor plan originally submitted by Lake Alfred shows the laundry to be in a single room, although HRS code requires three separate compartments in the laundry area. The life safety code requires various smoke compartments and fire and smoke doors which are not shown on the original Lake Alfred building plans.

57. HRS regulations require a minimum 20-foot vista outside each patient room. The plans submitted by Lake Alfred show the property line to be 10 feet from the proposed new patient wing. Lake Alfred failed to introduce any evidence that it would be able to comply with the 20-foot vista requirements.

58. There are several problems associated with the planned remodeling and renovation of Lake Alfred's existing facility. Because the existing structure is of Type V construction, the smoke membrane must

**229**

be installed in the ceiling of the existing patient rooms. Existing wood battens in the ceiling will have to be removed and a new smoke membrane installed in all ceiling spaces. This work would have to be done from within the patient rooms. Lake Alfred presented no evidence as to how patients will be transferred or otherwise cared for during the planned renovation and remodeling. This is of special concern because of the existing blown-in insulation in the ceilings, which is very messy to work with during remodeling.

59. The evidence clearly shows that the Meridian proposal is superior to the Lake Alfred proposal in terms of the methods of construction, the cost of construction, and the safety afforded to the patients of the facility.

## CONCLUSIONS OF LAW

The Division of Administrative Hearings has jurisdiction over the parties and the subject matter of these proceedings. Section 120.57(1), *Florida Statutes.*

Section 120.57(1) proceedings such as this are *de novo* proceedings intended to formulate final agency action, not to review prior action or action taken preliminarily. A certificate of need is a license within the meaning of Section 120.57(1), *Florida Statutes.* The applicants have the burden of proving entitlement to a license. The award of a certificate of need must be based on a balanced consideration of all statutory and rule criteria.

Prior to the formal administrative hearing, the parties stipulated that a need for 29 additional nursing home beds exists in Polk County for the January, 1989 planning horizon. In reliance on that stipulation, Meridian submitted various "updates" to its original application which contained information on the revenue and expenses, staffing levels, and construction costs associated with building and operating a 29-bed portion of the original request for 120 beds. Lake Alfred also submitted various updates to its original application, but Lake Alfred did not change the number of beds it was seeking.

HRS and Lake Alfred objected to the admission of Meridian's "updates" on the ground that the updates contained new information and as such constituted an "amendment" to Meridian's original application, prohibited by Rule 10-5.008, *Florida Administrative Code.* Meridian objected to Lake Alfred's updates on the ground that Lake Alfred had not changed the size of its project and that the updates were an attempt to make Lake Alfred's original application more competitive. The legal issues presented are whether Meridian is entitled

**230**

to "scope down" the size of its project and present information at the final hearing relating to the new, smaller portion of its original application and whether Lake Alfred is entitled to revise and update its original application even though the scope of the project has not changed.

Section 381.494(8)(c), *Florida Statutes,* provides in part:

Upon review of the application for a certificate of need in accordance with the district plan and with criteria established by paragraph (6)(c) and administrative rules, the department shall issue or deny the certificate of need in its entirety or *for identifiable portions of the total project.* [Emphasis supplied.]

The statute gives HRS the express authority to grant "identifiable portions" of a CON application. Twenty-nine beds are an "identifiable portion" of Meridian's original 120-bed application. The updates submitted by Meridian at hearing simply provide information related to the costs of building and operating a 29-bed addition rather than a 120-bed addition. The position taken by HRS in this case that it will not consider an "identifiable portion" of Meridian's application would render the statute meaningless because applicants would be foreclosed from their statutory right to obtain a CON for a smaller number of beds than originally requested simply because they failed to guess the number of beds for which HRS would find a need.

In *Health Care and Retirement Corporation of American d/b/a Nursing Center of Highlands County vs. Department of Health and Rehabilitative Services,* 9 FALR 1081, an applicant attempted to update its application during the final hearing to show that it would provide a special Alzheimer's Unit at its nursing center. The original application did not contain any mention of the Alzheimer's Unit. HRS concluded that the applicant could not update its application to offer services that were not proposed in the original application:

An applicant is not allowed to update during 120.57 proceedings by adding additional services, beds, construction, or other concepts not initially reviewed by HRS. 9 FALR at 1082.

Here, Meridian did not attempt to increase the number of beds it was seeking, and Meridian did not attempt to offer new services that were not offered in the original application. Meridian is entitled to provide information relating to an identifiable portion of its original application.

A recent Final Order issued by HRS provides the agency's latest position on the propriety of updating/amending CON applications during the administrative hearing. In *Hialeah Hospital, Inc. vs. Depart-*

*ment of Health and Rehabilitative Services, et al.,* DOAH Case No. 85-3998 (Final Order entered May 1, 1987, the Hearing Officer concluded:

New information presented at the formal administrative hearing which is a substantial change to an important portion of the application, and which reasonably might have caused HRS to decide the application differently if believed to be true, is the type of information which should be excluded at the formal hearing pursuant to Rule 10-5.008(4). New information based on more current estimates of population, more current calculations of cost, more detailed schematic drawings, and the like, however, should be allowed and considered at the formal administrative hearing, so long as such new information does not meet the above definition of a substantial change to the application. (Pages 35-36)

HRS adopted the Recommended Order and further enunciated HRS' position on the updating and amendment of CON applications:

It is recognized that more than a year may pass between the free form decision by HRS and the final 1210.57 hearing and this passage of time may require updating an application by evidence of changed circumstances such as the effect of inflation on interest and construction costs. For the sake of clarity HRS would avoid the use of the word "amendment" to describe such updating. Such evidence of changed circumstances beyond the control of the applicant is relevant to the original application and admissible at the 120.57 hearing. (Pages 3-4)

The updates submitted by Lake Alfred increased the staffing levels, increased the construction costs to a more realistic figure (even though the evidence shows that construction costs have been very stable for the last two years), and revised and improved the floor plans of the proposed facility. These are all changes designed to cure defects in Lake Alfred's original application and are not the result of extrinsic factors.

The *Hialeah Hospital* decision, *supra,* must be read in conjunction with Section 381.494(8)(c), to allow applicants such as Meridian to compete for a pool of beds which may be smaller than the number of beds requested in the original application. HRS' refusal to consider granting a CON for a smaller portion of Meridian's original application constitutes a failure to exercise its statutory responsibilities. By now allowing Meridian to carve out an "identifiable portion" to compare with Lake Alfred, HRS would in effect treat Lake Alfred as the sole applicant in this batching cycle which is clearly not the case.

The use of updates and the award of CONs for identifiable portions

232

of the original project furthers one of the prime goals of the Court's mandate in *Gulf Court Nursing Center vs. Department of Health and Rehabilitative Services,* 483 So.2d 700 (Fla. 1st DCA 1986): to reduce the protracted litigation resulting from an applicant's desire to prolong its case for as long as possible in the hopes that circumstances will change and the application will be viewed more favorably by HRS. Here, the parties agreed at the time of hearing that only 29 new nursing home beds were needed. Meridian did not seek a continuance with the hope that the need for beds might increase in the future; instead, Meridian chose to compete against Lake Alfred for the 29 beds that are available. Meridian is entitled to rely on the statutory authority given to HRS by Section 381.494(8)(c) to awards CONs for an identifiable portion of Meridian's original application, and it was proper for Meridian to provide information relating to a 29-bed addition.

The parties stipulated that 29 nursing home beds are needed in Polk County in the January, 1989 planning horizon. Neither applicant requested approval for more than 29 nursing home beds. Polk County is the applicable subdistrict for health care planning purposes, and no evidence was presented to show that either applicant fails to meet the local health planning criteria applicable to Polk County. Consequently, it is concluded that both applications satisfy the need criteria contained in Section 381.494(6)(c)1, *Florida Statutes.*

Both applicants presented evidence relating to the quality of care that would be provided at their respective facilities. The evidence shows that Meridian's proposed facility would be staffed at levels higher than the minimums required by Florida regulations and higher than those proposed by Lake Alfred. The evidence further shows that Meridian will use more licensed staff than Lake Alfred. Lake Alfred's original application projected staffing levels below the minimums required by HRS regulations. Lake Alfred "updated" its proposed staffing levels in an attempt to correct the deficiencies in the original application. Staffing levels are a significant factor in determining the quality of care at a nursing home and the staffing levels are an element that HRS gives significant weight to in determining the relative merits of each application. Lake Alfred did not change the number of beds it was requesting and Florida staffing requirements have not changed since Lake Alfred originally submitted its application.

The evidence shows that Meridian will provide more hours of direct patient care per day and will spend more dollars on direct patient care per day than Lake Alfred. Hours of patient care per day and the amount spent on direct patient care per day are quantifiable, objective

indicators of an applicant's ability to provide quality nursing home care.

The training and incentive programs provided to the staff at Meridian's facility are superior to those proposed by Lake Alfred. The evidence establishes that Meridian's intensive staff training should result in higher quality of care being provided at Meridian's facility than at Lake Alfred's.

The commitment of resources by the parent corporation of each applicant differs significantly. Meridian proposes to devote all of its available resources, including staff training, quality assurance programs, and capital resources, necessary to ensure that the highest quality of care is provided at its proposed facility in Polk County. Lake Alfred, on the other hand, can expect only minimal assistance from its parent company, Adventist Health System/Sunbelt. The lack of commitment to Lake Alfred by its corporate owner is especially worrisome given the fact that Adventist Health System/Sunbelt is part of a very large corporate provider of health care which enjoys the not inconsiderable advantages of nonprofit, tax-exempt status. Lake Alfred presented testimony as to the critical need for renovations and remodeling of its facility, which is nearly 20 years old, but its corporate owner is apparently unwilling to engage in any renovations or upgrading of the patient services offered at Lake Alfred without first obtaining the increased revenues associated with new beds. Lake Alfred admitted it could renovate and remodel without obtaining a certificate of need. The failure to commit a relatively small amount of resources to an aging facility is indicative of the low priority given to quality of care by Adventist Health Systems/Sunbelt.

Meridian showed that it will provide special programs and patient services not offered by Lake Alfred. Meridian's respite care programs, telephone reassurance, assessment counseling, and the unique "Quality of Life" program are superior to the services offered by Lake Alfred. Lake Alfred introduced no evidence that it planned on offering any services other than those minimum services required by HRS regulations.

Based on all of the evidence relating to quality of care, it is clear that Meridian will provide superior care and that Meridian's application best satisfies the quality of care criteria contained in Section 381.494(6)(c)2 and 3, *Florida Statutes.*

Both applicants, and/or their parents, operate a number of health care facilities in Florida and other states. Both applicants benefit economically from the joint purchasing power and economies of scale

234

associated with multi-facility health care organizations. Meridian, however, engages in corporate-wide training, research, and the sharing of resources among all of its facilities to improve the quality of service and care offered to residents of Meridian facilities. Lake Alfred, on the other hand, receives little assistance from its corporate owner to improve the services at its facility. The evidence shows that Meridian's application best satisfies the criteria contained in Section 381.494(6)(c)5, *Florida Statutes.*

The parties presented a great deal of evidence regarding the financia feasibility of their projects. The unrebutted evidence shows that Meridian's proposal will be financially feasible in both the near and long-term. The projected patient utilization, projected patient charges, and projected expenses for Meridian's facility are both reasonable and realistic. Meridian's application satisfies the financial feasibility criteria contained in Section 381.494(6)(c)9, *Florida Statutes.*

The various projections relating to the expected revenues, expenses, and construction costs of Lake Alfred's project contain many discrepancies and contradictions. Lake Alfred's own witnesses were unable to agree on the proper amount of certain expenses, such as the amount that Lake Alfred would spend on patient care. There was also confusion as to the exact size of the proposal, the cost of construction and renovation, and whether the project could even be licensed by HRS. Given the obvious confusion among Lake Alfred's witnesses and the inconsistencies in Lake Alfred's applications, there is a lack of competent evidence in the record to show that Lake Alfred's proposal will be financially feasible. Lake Alfred's application fails to satisfy the financial feasibility criteria contained in Section 381.494(6)(c)9, *Florida Statutes.*

There is no evidence that either applicant would adversely affect the cost of nursing home services in Polk County or would unfairly compete against existing nursing homes in Polk County.

The type and method of construction proposed by Meridian is fair superior to that of Lake Alfred. The Type I construction used by Meridian provides superior fire safety for nursing home residents than does Lake Alfred's Type V construction.

The evidence shows that serious questions exist as to the actual cost of renovating and remodeling Lake Alfred's existing facility. Rule 10D-29.121(7), *Florida Administrative Code,* provides:

(a) If within any period of 12 months alterations, conversions, renovations, or repairs, costs in excess of 50 percent of the then physical value of the nonconforming building as determined by the

235

sponsor, architect, or engineer and approved by the Department are made, such building shall be made to conform to each and every standard for a new facility.

. . . . . . . . . . . .

(c) If the cost of such alterations, conversions, renovations or repair of the amount of such damage is more than 25 percent but not more than 50 percent of the then physical value of the nonconforming building, the degree of compliance with the facility standards shall be determined by the department.

The rule requires an applicant proposing substantial renovation and remodeling work to bring the older portion of the facility up to current code standards if the cost of the renovations and remodeling exceed a certain value. The evidence suggests Lake Alfred may have difficulty in complying with Rule 10D-29.121(7). There is no credible evidence in the record as to the actual cost of renovating and remodeling Lake Alfred's facility. HRS' witness admitted the agency failed to consider the cost of renovation and code work to Lake Alfred's existing facility when it originally reviewed Lake Alfred's application.

Meridian's facility will be of safer construction than Lake Alfred's project and can be constructed at a reasonable cost. The evidence shows that Meridian's proposal best satisfies the criteria contained in Section 381.494(6)(c)13, *Florida Statutes.*

## RECOMMENDATION

Based upon the foregoing Findings of Fact and Conclusions of Law, it is

RECOMMENDED that a Final Order be entered granting Meridian's CON application for 29 additional nursing home beds and denying Lake Alfred's CON application for an additional 20 beds.

RECOMMENDED this 7th day of July, 1987, in Tallahassee, Florida.